**CITY OF ALMATY, Kazakhstan and BTA Bank JSC, Plaintiffs,**

**v.**

**Mukhtar ABLYAZOV, Viktor Khrapunov, Ilyas Khrapunov, and Triadou SPV S.A., Defendants.**

15–CV–5345 (AJN)

United States District Court, S.D. New York.

Signed 09/26/2017

778

Peter M. Skinner, Randall Wade Jackson, Matthew Lane Schwartz, Boies, Schiller & Flexner LLP(NYC), New York, NY, for Defendants.

## AMENDED MEMORANDUM & ORDER

ALISON J. NATHAN, District Judge:

This complex litigation concerns an alleged conspiracy by which prominent citizens of Kazakhstan purportedly looted billions of dollars from the City of Almaty, Kazakhstan ("Almaty") and BTA Bank JSC ("BTA" and, together with Almaty, the "Kazakh Entities"), a formerly state-owned banking institution based in Kazakhstan, and then laundered the stolen funds around the world, including ultimately by investing in New York City real

estate projects. Now before the Court are three motions to dismiss and one motion for joinder. Specifically: (i) crossclaim Defendant Triadou SPV S.A. ("Triadou") moves to dismiss this action in its entirety for lack of subject matter jurisdiction in light of the Court's December 2016 dismissal of the only remaining federal claims; (ii) the Kazakh Entities move for joinder of FBME Bank Ltd. ("FBME") as a party to this action; and (iii) crossclaim Defendants Mukhtar Ablyazov, Viktor Khrapunov, and Ilyas Khrapunov (together, the "Individual Defendants") move to dismiss all claims asserted against them. For the reasons set forth below, Triadou's motion to dismiss is DENIED, the Kazakh Entities' motion for joinder is DENIED, and the Individual Defendants' motions to dismiss are GRANTED in part and DENIED in part.

## I. Background

The Court has recounted the factually and procedurally complex background of this case in several prior substantive decisions. It does so again here solely to the extent necessary to contextualize the motions at issue.

### A. Factual Allegations

Almaty, the largest city in Kazakhstan, claims that its former mayor Viktor Khrapunov, along with certain associates and family members including his son Ilyas Khrapunov, embezzled approximately $300 million from Almaty between approximately 1997 and 2004, principally by appropriating various public assets for personal use. Dkt. No. 219 ¶¶ 45–55.[1] Often, Almaty claims, this was achieved in one of two ways: fraudulent auctions in which Khrapunov confederates acquired valuable as-

sets at nominal prices; or Viktor Khrapunov's exercise of eminent domain power to seize private property and transfer it to entities owned or controlled by the Khrapunovs. *Id.* ¶¶ 49–55. BTA, for its part, claims that its former chairman Mukhtar Ablyazov siphoned more than $6 billion out of BTA between approximately 2005 and 2009, primarily through a series of fraudulent loans to valueless entities owned or controlled by Ablyazov himself. *Id.* ¶¶ 28–33.

The Kazakh Entities further allege that, in order to evade law enforcement, the Individual Defendants—who were related by marriage—joined together to move the stolen funds out of Kazakhstan and to launder them through a series of shell companies, sham transactions, and outwardly-legitimate investments. *See, e.g., id.* ¶¶ 56–59, 68–72, 77–97. To help accomplish this, the Individual Defendants allegedly created, among other things, a Switzerland-based real estate investment vehicle called SDG Capital, S.A. ("SDG") into which they funneled hundreds of millions of dollars of illicit proceeds before engaging in a sham sale of the company to conceal their continued control. *Id.* ¶¶ 58, 78–84. The Individual Defendants then purportedly facilitated the creation of several entities under Luxembourg law for the purpose of investing stolen funds in United States-based real estate projects. *Id.* ¶¶ 86–87. Among these entities was Triadou, a special purpose vehicle wholly owned and controlled by SDG—and thus purportedly by the Individual Defendants. *Id.*

In 2012 and 2013, Triadou, acting at the direction of the Individual Defendants, invested funds allegedly embezzled from the

---

1. Unless otherwise noted, all citations herein concerning the Kazakh Entities' allegations refer to the Kazakh Entities' First Amended Crossclaims, filed on September 7, 2016,

which—as discussed further below—constitute the operative pleading in this case. *See* Dkt. No. 219 (the "Amended Crossclaims").

Kazakh Entities in several New York City real estate projects, including the Flatotel and the Cabrini Medical Center, with prominent New York-based real estate developer Joseph Chetrit and several of his corporate affiliates (the "Chetrit Entities"). *Id.* ¶¶ 88–97, 111–13. Funding for these investments was allegedly wired to escrow accounts maintained by counsel for the Chetrit Entities in the United States from accounts held by a Dubai-based private contracting entity called Telford International Limited ("Telford") (which was allegedly controlled by the Individual Defendants) in FBME, which is a Tanzanian-headquartered financial institution with operations primarily in Cyprus. *Id.* ¶¶ 21, 78, 98–106, 111–13. The Kazakh Entities allege that Telford's FBME accounts—which were managed by Eesh Aggarwal, a close financial advisor to Ablyazov—contained and were used to "covertly move and invest" funds stolen by Ablyazov from BTA, and that FBME "had a history of moving funds for Aggarwal and Ablyazov with no questions asked." *Id.* ¶¶ 99–102. True to form, the Kazakh Entities assert, FBME executed direct transfers to the Chetrit Entities' counsel "despite their blatant indicia of money laundering." *Id.* ¶ 105. The Kazakh Entities further allege that, in order to consummate these transactions and ensure concealment of the stolen funds, Triadou accepted contract terms on at least one investment that were unreasonably favorable to Chetrit and the Chetrit Entities. *See, e.g., id.* ¶¶ 97, 148.

In 2014, facing mounting law enforcement pressure abroad and litigation initiated by Almaty in federal court in California, Ablyazov and the Khrapunovs allegedly caused Triadou to liquidate its real estate assets in New York so that stolen funds could be removed from the United States and hidden once again. *Id.* ¶¶ 114–123. To that end, Triadou—acting at the direction of the Individual Defendants—engaged in a sham transaction with the Chetrit Entities whereby Triadou assigned its interest in the Flatotel to the Chetrit Entities and released its entitlement to equity in the Cabrini Medical Center in exchange for a "fraction of the fair market value of the properties" and personal bribery payments to at least one Triadou executive. *Id.*

Since 2009, BTA has initiated multiple proceedings in the U.K. premised on Ablyazov's purported embezzlement and has secured numerous judgments against Ablyazov and his associates (the "U.K. Judgments"), leading to awards of over $4 billion in damages, asset freeze and receivership orders, and sanctions against Ablyazov for violations of the same. *Id.* ¶¶ 35–41. As of the filing of the Amended Crossclaims, Ablyazov had been sentenced to 22 months imprisonment for contempt of court in the U.K. and was detained in a French prison pending extradition proceedings. *Id.* ¶¶ 38–42. The Khrapunovs, for their part, were residing in Switzerland and facing multiples charges in Kazakhstan arising from purported theft of public property and money laundering, among other things. *Id.* ¶¶ 62–63. The Kazakh government had secured the assistance of the Swiss authorities in its ongoing efforts to prosecute those charges, and the Public Prosecutor of Geneva had ordered Swiss accounts and assets affiliated with the Khrapunovs frozen. *Id.* ¶¶ 64–65. Kazakhstan, moreover, had formally requested the extradition of at least Viktor Khrapunov. *Id.*

### B. Procedural Posture

This litigation began as an interpleader action against Triadou and Almaty brought in New York State Supreme Court by the Chetrit Entities, which claimed to face multiple liability under their 2014 assign-

ment agreements with Triadou. Dkt. No. 25 ¶¶ 11–17. Almaty removed the action to federal court on July 9, 2015. Dkt. No. 1.

In its answer to the interpleader complaint, Almaty asserted counterclaims against the Chetrit Entities, crossclaims against Triadou, and third-party claims against Ablyazov, the Khrapunovs, and Joseph Chetrit, including claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, and various claims under New York State law. Dkt. No. 49. All claims brought by or against the Chetrit Entities or Chetrit were ultimately resolved through dismissal or settlement.

On June 21, 2016, the Court granted a motion by Almaty and BTA to formally join BTA, the Khrapunovs, and Ablyazov to the pending dispute between Almaty and Triadou, and largely denied a motion by Triadou to dismiss the Kazakh Entities' crossclaims, while reserving judgment on whether the RICO claims were impermissibly extraterritorial pending supplemental briefing on the impact of the Supreme Court's then-recent decision in *RJR Nabisco, Inc. v. European Cmty.*, —— U.S. ——, 136 S.Ct. 2090, 195 L.Ed.2d 476 (2016). *See generally* Dkt. No. 174 (the "June 21 Decision").

Approximately one week after issuance of the June 21 Decision, the Individual Defendants appeared in the litigation for the first time and submitted letters requesting leave to move to dismiss the Kazakh Entities' claims against them, with Ablyazov, at least, representing that he had not been properly served with process prior to the Court's June 21 Decision. *See* Dkt. Nos. 177–81. The parties' ultimately consented to the filing of the Individual Defendants' proposed motions, and the Court entered a jointly proposed briefing schedule on July 25, 2016. Dkt. No. 200.

On July 29, 2016, the Court conducted an initial pretrial conference and entered a Civil Case Management Plan and Scheduling Order (the "Scheduling Order"). *See* Dkt. No. 205. The Scheduling Order provided, among other things, that "[a]mended pleadings may not be filed and additional parties may not be joined except with leave of the Court" and that "[a]ny motion to amend or join parties shall be filed within 30 days from the date of this Order." *Id.* at 2.

The Individual Defendants filed motions to dismiss on August 17, 2016 in accordance with the parties' agreed-upon briefing schedule. Dkt. Nos. 207–12. In response, the Kazakh Entities submitted a letter advising the Court and their adversaries of their intention to file amended crossclaims and noting that, "[i]n the process of amending the crossclaims, the Kazakh Entities may seek to join additional crossclaim defendants." Dkt. No. 213 at 1–2. The Kazakh Entities observed that their anticipated filing date of September 7, 2016 would fall outside of the 30–day period established in the Scheduling Order for motions to amend or join, but contended that "the subsequent motions to dismiss filed by the Individual Defendants" rendered that deadline inapplicable and instead that the default deadlines for motions to amend set forth in Federal Rule of Civil Procedure 15 and Rule 3.F of this Court's Individual Practices in Civil Cases were "controlling in this instance." *Id.* Triadou interposed a limited objection, arguing that any amendments should be directed solely to "allegations/claims against Mr. Ablyazov or the Khrapunovs," and not "to any allegations or claims directed at Triadou or all Crossclaim-defendants generally," given that the Kazakh Entities had foregone an earlier opportunity to amend in response to the Triadou's motion to dismiss. *Id.* Appx. A. In light of Triadou's objection, the Court granted the Kazakh Entities' application to file amended crossclaims and/or joinder motions by Septem-

ber 7, 2016 with the express caveat that "[a]ny such amendments and/or motions shall relate solely to the Kazakh Entities' claims or allegations directed against the Individual Defendants." Dkt. No. 214.

On September 7, 2016, the Kazakh Entities filed the Amended Crossclaims, as well its motion to join FBME. Dkt. Nos. 216–19.

As discussed further below, Triadou immediately objected to the joinder motion (as well as to one paragraph included in the Amended Crossclaims), arguing that the motion violated the Court's order limiting the scope of any such applications to matters concerning the Individual Defendants. Dkt. No. 223. Triadou subsequently filed a formal brief opposing FBME's joinder, later joined by the Individual Defendants. Dkt. Nos. 226, 230, 234. As for the Amended Crossclaims, the Individual Defendants filed renewed motions to dismiss on September 26, 2016, which were fully submitted on November 4, 2016. *See, e.g.*, Dkt. Nos. 227–29, 231–33, 246–47.

Separately, and as alluded to above, the Court received supplemental briefing on the question raised by Triadou's original motion to dismiss of whether the Supreme Court's June 2016 decision in *RJR Nabisco* precluded the Kazakh Entities' RICO claims as impermissibly extraterritorial. Dkt. Nos. 188, 195–97, 202, 240, 244, 248–50. In a Memorandum & Order dated December 23, 2016, the Court held that it did and, accordingly, dismissed all RICO claims with prejudice. Dkt. No. 257 (the "December 23 Decision"). Subsequently, the Court denied the Kazakh Entitles' motion to certify the December 23 Decision for interlocutory appeal. Dkt. No. 304. In response to the December 23 Decision, Triadou sought leave to file a brief arguing that the Kazakh Entities' remaining claims—all of which arise under state law—should be dismissed for lack of subject matter jurisdiction. The Court granted

the request, and briefing on that issue was completed on February 10, 2017. Dkt. Nos. 260, 268, 278, 281.

Merits discovery has been proceeding in this matter since entry of the Court's Scheduling Order, and is being supervised by Magistrate Judge Katherine H. Parker.

## II. Discussion

In light of the Court's own obligation to assess questions concerning its subject matter jurisdiction, it first addresses Triadou's motion to dismiss this action on that ground. Determining that it may continue to exercise jurisdiction over the case, it then proceeds to consider the Kazakh Entities' joinder motion and the Individual Defendants' motions to dismiss in order of submission.

### A. Subject Matter Jurisdiction

Triadou contends that the Kazakh Entities' remaining claims should be dismissed for lack of subject matter jurisdiction. Specifically, Triadou notes that with the departure of Chetrit and the Chetrit Entities from the litigation and the dismissal of the Kazakh Entities' only federal claims (i.e., the RICO claims), all that remains of this action are state law claims pending between parties—the Kazakh Entities, Triadou, and the Individual Defendants—lacking in complete diversity. As such, Triadou argues, the Court does not have original jurisdiction over the remaining claims, and it should decline to exercise discretionary supplemental jurisdiction under 28 U.S.C. § 1367. *See, e.g.*, Dkt. No. 268 at 1, 3–10.

The Kazakh Entities respond that the Court maintains diversity jurisdiction under 28 U.S.C. § 1332(a) because complete diversity existed both when the original interpleader action was initiated and when the Kazakh Entities filed their counter, cross, and third-party claims, and jurisdiction generally " 'depends upon the state of

things at the time of the action brought.'" Dkt. No. 278 at 1–2, 4–7 (quoting *Grupo Dataflux v. Atlas Glob. Grp., L.P.*, 541 U.S. 567, 570, 124 S.Ct. 1920, 158 L.Ed.2d 866 (2004)). Independently, the Kazakh Entities aver, because Almaty constitutes a "foreign state" as defined in the Foreign Sovereign Immunities Act ("FSIA"), original jurisdiction exists under 28 U.S.C. § 1330, which covers nonjury civil actions brought against foreign states. And for the same reason, they argue, the Court has removal jurisdiction under 28 U.S.C. § 1441(d), which permits foreign states to remove civil actions brought against them in state court. *Id.* at 2–4. Alternatively, the Kazakh Entities urge the Court to exercise supplemental jurisdiction over the remaining claims because, in light of the substantial time and resources invested in this matter to date, dismissal or remand at this stage purportedly "would result in enormous judicial inefficiency and unfairness to the parties." *Id.* at 7–10.

The Court agrees that, if nothing else, Sections 1330 and Section 1441(d) provide a basis for jurisdiction, and, accordingly dismissal on jurisdictional grounds is unwarranted.

Under Section 1441(d), "[a]ny civil action brought in a State court against a foreign state as defined in section 1603(a) of this title may be removed by the foreign state to the district court of the United States for the district and division embracing the place where such action is pending." 28 U.S.C. § 1441(d). And under Section 1330(a), "[t]he district courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state as defined in section 1603(a) of this title . . . ." 28 U.S.C. § 1330(a).

As noted above, Almaty removed this action from New York state court shortly after the Chetrit Entities' filed the original interpleader complaint. Triadou does not—

and could not—dispute that Almaty, Kazakhstan's largest city, is a foreign state within the definition set forth in Section 1603(a), which includes among other things "political subdivision[s] of a foreign state." 28 U.S.C. § 1603(a). Triadou does argue, however, that with the dismissal of the original interpleader complaint, no claims against a foreign state remain in this action. To the contrary, it emphasizes, the only surviving claims are "brought *by* a foreign state, not '*against*' one," and, in any event, they were filed in federal court in the first instance well after removal of this action had been effected. Dkt. Nos. 268 at 4 n.4 (quoting 28 U.S.C. § 1441(d)); 281 at 3. As such, according to Triadou, any concerns about the potential sensitivities of lawsuits targeting foreign states underlying the removal provisions of Section 1441(d) simply "are not implicated here," and that Section provides no basis for jurisdiction over what remains of this case. Dkt. No. 281 at 3.

That argument, which Triadou presses essentially without authority, is inconsistent with the broad reading accorded Section 1441(d) by courts around the country. As the Eleventh Circuit has aptly summarized, both the plain language of the statute—in particular, its use of the phrase "any civil *action*"—and its legislative history demonstrate that, "where a claim has been filed against a foreign state, Congress did not intend removal jurisdiction to be limited to some subset of the claims or parties involved in that action," but rather "clearly meant to grant removal jurisdiction over more than just the 'claims' asserted against a foreign state." *In re Surinam Airways Holding Co.*, 974 F.2d 1255, 1258–59 (11th Cir. 1992); *see also Teledyne, Inc. v. Kone Corp.*, 892 F.2d 1404, 1409 (9th Cir. 1989) (noting that Congress declined to provide simply for "*separation* of the claims against the foreign state from claims against other parties" and conclud-

ing as such that Section 1441(d) instead "expresses an intention to give sovereign foreign defendants an absolute right to a federal forum coupled with an unusually strong preference for the consolidation of claims") (emphasis in original). Indeed, several circuits, relying on that very reasoning, have concluded that Section 1441(d) "authorizes the removal of the entire case, even if there are nonforeign defendants." *Davis v. McCourt*, 226 F.3d 506, 509–11 (6th Cir. 2000) (quotation marks and citation omitted); *see also In re Asbestos Prods. Liab. Litig.*, 536 Fed.Appx. 183, 190 (3d Cir. 2013) (Summary Order) ("[W]e conclude that, when a foreign-state defendant removes an action under the FSIA, the district court is empowered to exercise jurisdiction over the entire action, including claims against other non-foreign defendants."); *In re Air Crash Disaster Near Roselawn, Ind. on Oct. 31, 1994*, 96 F.3d 932, 941–43 (7th Cir. 1996) ("Nearly all courts to have considered this issue have … held that where minimal diversity exists between parties, a foreign state may invoke § 1441(d) to remove an entire suit."); *Nolan v. Boeing Co.*, 919 F.2d 1058, 1064–66 (5th Cir. 1990) (because the "FSIA refers to an action, which is synonymous with the word 'case' and in federal practice includes all claims made by all parties," when a "third-party defendant avails itself of removal jurisdiction under section 1441(d), at least where minimal diversity exists between the parties to the main claims, it removes not just the third-party claims but the main claims as well"); *Teledyne*, 892 F.2d at 1407–1410 ("Under the FSIA, jurisdiction is extended over 'action[s]' against a foreign state, not simply over *claims* against a foreign state. This language is broad enough to cover the entire suit as brought by Teledyne since it was an action brought, in part, against a foreign state.") (emphasis in original); *cf. Kaiser v. Memorial Blood Ctr. of Minneapolis, Inc.*, 977 F.2d 1280, 1283 n.1 (8th Cir. 1992) ("[U]nlike removal in general, Congress intended the FSIA to be a broad removal provision in order to render uniform in procedure and substance the treatment of foreign sovereigns subjected to suits in American courts by assuring the availability of a federal forum.") (internal quotation marks omitted).

The Second Circuit does not appear to have squarely addressed the scope of removal jurisdiction under Section 1441(d). It has, however, relied on the Ninth Circuit's construction of the FSIA in *Teledyne* to conclude that the analogously worded 28 U.S.C. § 1333(1)—which uses the phrase "[a]ny civil *case*"—extends admiralty jurisdiction "to an entire case, including non-admiralty claims against a second defendant." *See Roco Carriers, Ltd. v. M/V Nurnberg Express*, 899 F.2d 1292, 1296–97 (2d Cir. 1990). And district courts in this Circuit have looked to the decisions cited above as persuasive authority in concluding, for example, that third-party foreign-state defendants may remove entire actions under Section 1441(d), rather than solely the subset of claims asserted against them. *See, e.g., Kully v. Aircraft Serv. Int'l Grp., Inc.*, 662 F.Supp.2d 259, 260–61 (E.D.N.Y. 2009).

To be sure, none of these cases presents precisely the same set of circumstances at issue here, but their reasoning—which the Court finds compelling—applies with no less force. The Kazakh Entities' claims have, for all intents and purposes, made Triadou, Ablyazov, and the Khrapunovs additional, non-foreign-state defendants in a "civil action" originally targeting a foreign state. There is no apparent reason why Almaty's concededly legitimate removal of that action would not bring all claims against those additional defendants (regardless of the asserting party) within the Court's jurisdiction in the same manner as, for example, a foreign-

state third-party defendant's removal would all claims against the original (non-foreign-state) defendant. *Cf. id.*

■ Furthermore, any suggestion that the absence from this action—as currently constituted—of live claims against the original foreign-state defendant (Almaty) presents a jurisdictional defect in and of itself is without merit. As the Third Circuit recently explained in *In re Asbestos Products Liability Litigation,* even the outright departure from the entire lawsuit of the foreign-state party that originally effected removal (a scenario not present here) "does not deprive the District Court of subject matter jurisdiction" over the remaining claims in the action, "as long as jurisdiction existed at the time the action was removed from state court." 536 Fed. Appx. at 190 n.15 (citing *Standard Fire Ins. Co. v. Knowles,* 568 U.S. 588, 133 S.Ct. 1345, 1349, 185 L.Ed.2d 439 (2013) ("For jurisdictional purposes, our inquiry is limited to examining the case "as of the time it was filed in state court. . . . " (internal quotation marks and citation omitted))).

Especially in the absence of any authority to the contrary, the Court concludes that it continues to have subject matter jurisdiction over this case in its entirety, including the Kazakh Entities' remaining state law claims. Accordingly, the Court need not and does not address the question of its original jurisdiction based on complete diversity of citizenship or of supplemental jurisdiction. Triadou's motion to dismiss on jurisdictional grounds is DENIED.

## B. Joinder of FBME

As intimated above, the posture of the Kazakh Entities' motion to join FBME as an additional defendant in this matter is somewhat unusual. The Kazakh Entities first filed a joinder motion early in this litigation, successfully bringing the Individual Defendants and others into the case.

*See* Dkt. Nos. 47, 174. They did not file any additional such motions in response to Triadou's original motion to dismiss their crossclaims. Nor did they, following entry of the Court's Scheduling Order on July 29, 2016, move for any further joinder during the expressly allotted 30-day period. Instead, the Kazakh Entities submitted a letter on August 25, 2016 (approximately four days before the expiration of that period), advising that they intended to file amended crossclaims in response to the Individual Defendants' then-recent motions to dismiss and requesting leave to file a belated joinder motion should the inclination arise "[i]n the process of amending the crossclaims." Dkt. No. 213. Upon Triadou's objection, the Court granted permission for the Kazakh Entities to file a further motion for joinder several days after the deadline established by the Scheduling Order but imposed the express condition that any such motion "relate solely to the Kazakh Entities' claims or allegations directed against the Individual Defendants." Dkt. No. 214. The Kazakh Entities then proceeded to move for the permissive joinder of FBME as an additional defendant to its crossclaims.

It is readily apparent from the face of the Kazakh Entities' motion papers that their joinder application does not "relate solely" to "claims or allegation directed against the Individual Defendants." The primary basis for the motion is, in sum and substance, that "FBME was a key participant in the alleged conspiracy" involving Triadou and the Individual Defendants, particularly in processing wire transfers to the United States in order to fund Triadou's—and thus, purportedly, the Individual Defendants'—investments in the Flatotel and the Cabrini Medical Center. *See, e.g.,* Dkt. No. 217 at 8–11. Indeed, the Kazakh Entities contend, for example, that joinder is appropriate in part because FBME "executed a series of wire transfers

from the accounts of [Telford] to accounts in New York for at least $69 million, primarily for Triadou's benefit," and that their proposed claims against FBME "are premised upon many of the same wire transfers" as its claims against both Triadou and the Individual Defendants. Dkt. No. 217 at 9–11; *see also id.* at 10 ("[W]ithout FBME's cooperation, the transfers alleged for the benefit of Triadou would not have been possible."). They also urge that "[e]videntiary concerns favor joinder" in part because "one critical question in this action will the source of the funds transferred by Telford for Triadou's benefit." *Id.* at 12–13. The Amended Crossclaims, moreover, add a claim against FBME for aiding and abetting various torts committed—allegedly—by Triadou as well as by the Individual Defendants. Dkt. No. 219 ¶¶ 200–04.

For these reasons, Triadou, as noted above, immediately objected to the Kazakh Entities' joinder motion and requested that the Court summarily strike it as violative of its limiting order. Dkt. No. 223. The Kazakh Entities, responding to Triadou's objection, do not deny that their joinder application does not relate "solely" to Ablyazov and the Khrapunovs but maintain that it would be "impossible" for any "new allegations" to "have nothing to do with Triadou whatsoever," given that "joinder requires common questions of law or fact." Dkt. No. 224.

These circumstances invite, if nothing else, the threshold question of the appropriate standard to apply to the Kazakh Entities' joinder motion. Federal Rule of Civil Procedure 13(h) instructs that "Rules 19 and 20 govern the addition of a person as party to a counterclaim or crossclaim." Fed. R. Civ. P. 13(h). Rules 19 and 20, in turn, set forth the generally applicable conditions for required and permissive joinder, respectively. There is no dispute that the Kazakh Entities' motion implicates the latter. *See, e.g.,* Dkt. Nos. 217 at 12, 226 at 2–3. Under Rule 20's permissive joinder provisions, "defendants may be joined if the claims against them arise 'out of the same transaction, occurrence, or series of transactions or occurrences,' and 'any question of law or fact common to all defendants will arise in the action.' " *Almazo v. M.A. Angeliades, Inc.,* No. 11-CV-1717(MGC), 2015 WL 6965116, at *5 (S.D.N.Y. Nov. 10, 2015). Assuming that these prerequisites are satisfied, a court may then, under Rule 21, allow joinder "at any time, on just terms." Fed. R. Civ. P. 21. Generally, "[i]n deciding whether to permit the addition of a party, the court applies the same standard of liberality under Rule 21 as that afforded motions [to amend pleadings] under Rule 15(a), which similarly states that the court should freely give leave when justice so requires." *Otegbade v. N.Y.C. Admin. for Children Servs.,* No. 12-CV-6298(KPF), 2015 WL 851631, at *2 (S.D.N.Y. Feb. 27, 2015) (quotation marks omitted).

█ Importantly, however, when a motion for joinder is made after "a deadline to join parties in a scheduling order has elapsed," it is subject to the heightened standard for untimely amendments set forth in Rule 16(b), which requires a showing of "good cause." *See id.* (collecting cases); *see also Tardif v. City of New York,* No. 13-CV-4056(KMW)(FM), 2015 WL 9257069, at *3 (S.D.N.Y. Dec. 7, 2015) ("Rule 16(b) is also applicable to a motion to add a party pursuant to Rule 21"); *Soroof Trading Dev. Co. Ltd. v. GE Microgen, Inc.,* 283 F.R.D. 142, 147 n.3 (S.D.N.Y. 2012) (noting that "[c]ourts in this district have concluded that Rule 16's good cause standard is applicable to both" amendments that add "new allegations" and those that "add a new party"). "Whether good cause exists turns on the 'diligence of the moving party.' " *The Port*

*Auth, Police Benevolent Ass'n, Inc. v. The Port Auth. of N.Y. & N.J.*, No. 15-CV-3526(AJN), 2016 WL 6083956, at *3 (S.D.N.Y. Oct. 17, 2016) (quoting *Parker v. Columbia Pictures Indus.*, 204 F.3d .326, ·340 (2d Cir.· 2000)). In particular, "the movant must show that the deadlines cannot be reasonably met despite its diligence." *Rent–A–Center, Inc. v. 47 Mamaroneck Ave. Corp.*, 215 F.R.D. 100, 104 (S.D.N.Y. 2003). "The Court may also consider any prejudice to the nonmoving party and the length of delay in filing the amendment." *Tardif*, 2015 WL 9257069, at *3 (internal quotation marks and citation omitted). The mere "absence of prejudice to a nonmoving party," however, does "not fulfill the good cause requirement of Rule 16(b)." *Estate of Ratcliffe v. Pradera Realty Co.*, No. 05-CV-10272(JFK), 2007 WL 3084977, at *1 (S.D.N.Y. Oct. 19, 2007) (internal quotation marks omitted).

Whether decided under Rule 16(b)'s more stringent standard or the more relaxed requirements of Rules. 21 and 15(a), a district court's resolution of a motion to join parties constitutes an exercise of its discretion and is reviewed only for abuse of that discretion. *See, e.g., Grochowski v. Phoenix Const.*, 318 F.3d 80, 86 (2d Cir. 2003); *Otegbade*, 2015 WL 851631, at *3–4.

Under the circumstances, Rule 16(b)'s "good cause" standard properly applies to the Kazakh Entities' motion to join FBME. Directly implicating as it does the source of the allegedly ill-gotten monies that funded the real estate investments by Triadou that are so central to the Kazakh Entities' claims against it, there can·be no ·real doubt that the application "relates" to Triadou and thus that it runs afoul of the Court's directive that any belated joinder motions relate "solely" to the Individual Defendants. While the Court has declined, and will continue to decline, Triadou's invitation to simply strike the joinder motion without further consideration, it finds, in the exercise of its discretion, that affording the motion the benefit of the Court's brief extension of the Scheduling Order—and thus treating it as timely under that Order—would be unwarranted. Accordingly, the Court will resolve the motion as it if were filed after· the deadline for joinder applications set forth in the Scheduling Order.

■ Applying Rule 16(d), the Court concludes that·the Kazakh Entities do not show good cause to support the belated joinder of FBME. As Triadou argues, the Kazakh Entities evidently possessed most, if not all, of the information marshalled to support their current request to join FBME for nearly a year before seeking leave to file the application, yet declined to include FBME in their first joinder motion (which targeted the Individual Defendants), to amend its pleading to include FBME in response to Triadou's original motion to dismiss, or to bring this motion within the original 30–day period set forth in the Scheduling Order. Dkt. Nos. 223 at 1–2; 226 at 6–8. Indeed, the Kazakh Entities' original Answer, Counterclaims, and Crossclaims, filed in October 2015, alleged at some length both FBME's role in the purported conspiracy and its ties to suspected money laundering. It asserted, for example, that "The Cross- and Counterclaim Defendants devised a plan to circumvent legitimate banks and wire funds directly from the Ablyazov–Khrapunov Group's offshore accounts with [FBME]" (which the United States government subsequently labelled ,a " 'foreign financial institution of primary money laundering concern' ") to the "escrow account of the Chetrit Group's long-time attorneys," that Telford in fact executed transfers from its accounts at FBME to the United States for Triadou's benefit, and that at the time FBME had been "the subject of press reports investigating the links between

FBME's activities in Cyprus and Ablyazov himself." Dkt. No. 49 ¶¶ 25, 109–11, 114. Moreover, the Kazakh Entities adduced substantial evidence concerning its proposed claims against FBME during the May 19, 2016 hearing on preliminary injunction and attachment motions, and cited that evidence in post-hearing briefing that predated the instant joinder motion by more than three months. *See, e.g.*, Dkt. No. 165 ¶¶ 99–109.

The Kazakh Entities do not substantially deny that they possessed the information that now forms the basis of their proposed claims against FBME well before filing their joinder motion. If anything, they confirm, for example, that a good deal of the relevant evidence "was unearthed in preparation for the evidentiary hearing on the attachment motion, which required the Kazakh Entities to investigate Triadou's connections to its funding source, [Telford], which maintained its accounts at FBME." *See, e.g.*, Dkt. Nos. 236 at 2, 11–12. Such preparation, of course, would have taken place prior to the May 2016 hearing and thus several months before the Kazakh Entities brought the instant joinder motion. Notably, moreover, despite couching their request for leave to submit a belated joinder motion as part of the "process" of amending their crossclaims in response to the Individual Defendants' motions to dismiss, Dkt. No. 213, the Kazakh Entities do not identify anything about those motions that prompted the joinder application or give any reason why that application could not been filed within the period set forth in the Scheduling Order (or substantially earlier).

Both Triadou and the Individual Defendants maintain that the Kazakh Entities' declination to join FBME until after the Individual Defendants moved to dismiss supports a conclusion that the Kazakh Entities' application is intended only to undercut a *forum non conveniens* defense—discussed further below—first raised unsuccessfully by Triadou but then arguably resuscitated by the Individual Defendants' subsequent appearance and consent to a foreign forum. *See, e.g.*, Dkt. Nos. 226 at 6–8, 234 at 1–2. The Court is not prepared to ascribe any such improper purpose to the Kazakh Entities on basis of timing and conjecture. But it does conclude that the Kazakh Entities have not shown—or even particularly tried to show—that their joinder motion could not, despite reasonable diligence, been filed sometime prior to the deadline set forth in the Scheduling Order. *See, e.g.*, *Rent–A–Center*, 215 F.R.D. at 104–05 (denying motion to amend under Rule 16(b) because "the substance of the defendants' 'new' claim was known when the defendants filed their original amended answer and added their counterclaim" and they did not "offer [an] explanation for why they failed to include the subject matter of the proposed amendment in their earlier amendment" or "try to explain why the deadline set forth in the Court's Scheduling Order could not be reasonably met"). The Court therefore exercises its discretion to DENY the Kazakh Entities' motion to join FBME.

## C. The Individual Defendants' Motions to Dismiss

The Court turns next to the Individual Defendants' motions to dismiss the Kazakh Entities' Amended Crossclaims. These motions—which were separately briefed by Ablyazov and the Khrapunovs but opposed in combined papers by the Kazakh Entities—raise a plethora of arguments, some of which require more discussion at this stage of the litigation than others. Notably, for example, a substantial portion of the parties' briefing addresses whether the Kazakh Entities' RICO claims should be dismissed. As discussed above, however, the Court subsequently dismissed those claims with prejudice as im-

permissibly extraterritorial in light of the Supreme Court's decision in *RJR Nabisco*. Naturally, then, the RICO claims warrant no further discussion here. In addition, the parties devote significant briefing to applicability of the doctrine of *forum non conveniens*. As discussed further below, the Court opined at some length on that issue in denying Triadou's original motion to dismiss and it will do so again here only to the extent necessary to address the Individual Defendants' novel arguments.

For purposes of this Memorandum and Order, the Individual Defendants' pertinent contentions can be divided into three groups[2]: (i) the entire action should be dismissed on the ground of *forum non conveniens*; (ii) the Kazakh Entities' individual state law claims fail under Rule 12(b)(6) as either inadequately pled or, in some cases, as time-barred; and (iii) the Court lacks personal jurisdiction over the Khrapunovs. The Court will address each set of arguments in turn.

### 1. *Forum Non Conveniens*

#### a. Legal Standard

"The decision to dismiss a case on *forum non conveniens* grounds 'lies wholly within the broad discretion of the district court and may be overturned only when ... that discretion has been *clearly abused*.'" *Iragorri v. United Techs. Corp.*, 274 F.3d 65, 72 (2d Cir. 2001) (*en banc*) (emphasis in original) (quoting *Scottish Air Int'l, Inc. v. British Caledonian Grp., PLC*, 81 F.3d 1224, 1232 (2d Cir. 1996)). "An evaluation of a motion to dismiss on the grounds of *forum non conveniens* proceeds in several stages." *Pollux Holding Ltd. v. Chase Manhattan Bank*, 329 F.3d 64, 70 (2d Cir. 2003). First, a court must determine "'whether the plaintiff's choice of forum is entitled to more or less defer-

ence.'" *Id.* (internal brackets omitted) (quoting *Iragorri*, 274 F.3d at 73). Regardless of the level of deference owed, the court "still must conduct the analysis set forth out in *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947)," and "determine whether an adequate alternative forum exists." *Id.* (citing *Iragorri*, 274 F.3d at 73). If it does, "the court must go to the third step and balance factors of private and public interest to decide, based on weighing the relative hardships involved, whether the case should be adjudicated in the plaintiff's chosen forum or in the alternative forum suggested by the defendant." *Id.* (citing *Gilbert*, 330 U.S. at 507–09, 67 S.Ct. 839). Dismissal based on this balancing analysis is warranted "when trial in the chosen forum would 'establish ... oppressiveness and vexation to a defendant ... out of all proportion to plaintiff's convenience,' or when the 'chosen forum [is] inappropriate because of considerations affecting the court's own administrative and legal problems.'" *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981) (alterations in original) (quoting *Koster v. (American) Lumbermens Mut. Cas. Co.*, 330 U.S. 518, 524, 67 S.Ct. 828, 91 L.Ed. 1067 (1947)). Moreover, "the greater the degree of deference to which the plaintiff's choice of forum is entitled" pursuant to the first prong of the analysis, "the stronger a showing of inconvenience the defendant must make to prevail in securing *forum non conveniens* dismissal." *Iragorri*, 274 F.3d at 74. Indeed, "unless the balance [of interests] is strongly in favor the defendant, the plaintiff's choice of forum"—if legitimate—"should rarely be disturbed." *Gilbert*, 330 U.S. at 508, 67 S.Ct. 839.

---

2. Because the Individual Defendants' contentions overlap substantially, the Court will, for the sake of convenience and clarity, not differentiate between Ablyazov's and the Khrapunovs' positions except where they materially diverge.

■ The moving party "bears the burden of proof on all of the elements of [a] motion" seeking dismissal under *forum non conveniens* grounds. *Bank of Credit Commerce Int'l (Overseas) Ltd. v. State Bank of Pakistan*, 273 F.3d 241, 246 (2d Cir. 2001).

### b. Dismissal Under the Doctrine of *Forum Non Conveniens* Continues to be Unwarranted

The Court begins by noting that over a year ago it rejected, at some length, Triadou's argument in its own motion to dismiss that the Kazakh Entities' claims should be dismissed on *forum non conveniens* grounds because Switzerland provides a more appropriate forum for this litigation. *See* Dkt. No. 174 at 6–19. In the June 21 Decision, the Court determined that the Kazakh Entities' choice of forum—to the extent it could be characterized as their choice given the Chetrit Entities' initiation of this action—"was 'motivated by legitimate reasons'" and that there was "a 'bona fide connection' between this lawsuit and the New York forum" given the purported laundering of stolen funds through New York real estate developments, thus entitling the forum selection to "substantial deference." *Id.* at 7–9 (quoting *Iragorri*, 274 F.3d at 72–73). It further concluded that Triadou had not carried its burden of establishing that Switzerland would not be an adequate alternative forum for the Kazakh Entities' claims because it had failed to demonstrate that Ablyazov (then incarcerated in France) would be amenable to process in Switzerland and could not guarantee that the Kazakh Entities' claims against the Individual Defendants would not be barred by Switzerland's statute of limitations—a defense that Triadou itself had agreed to waive. *Id.* at 9–12. Finally, the Court engaged in an extensive balancing analysis of the relevant private and public interest factors,

and determined, as an alternative ground for its holding, that the final step of the *forum non conveniens* framework "demonstrate[d] that dismissal was not appropriate," even if Switzerland were an adequate forum. *See id.* at 12–19 (concluding "that the sources of proof available in Switzerland are roughly comparable in quantity and in relevance to the sources of proof available in New York"; that "the ability to obtain live witness testimony [did] not weigh strongly one way or the other"; that other litigation logistics would suffer from significant "inconveniences]" regardless of the forum; that there was "little net convenience to be gained by sending this dispute to Switzerland"; that "both Switzerland and New York have legitimate interest in the dispute"; and that Swiss law would have "little, if any, apparent relevant to this dispute").

The Individual Defendants ask the Court, essentially, to revisit its holding on three main grounds. First, the deference owed to the Kazakh Entities' choice of forum for their claims against the Individual Defendants is purportedly "undermined" by the fact that Almaty has also initiated related proceedings in Switzerland and has recently pursued claims in that forum against another member of the Khrapunov family. Dkt. No. 232 at 22. Second, Switzerland is indeed an adequate alternative forum, according to the Individual Defendants, because they would consent to service of process in that country and agree (like Triadou before them) to waive any statute of limitations defenses under Swiss law if this action were dismissed pursuant to the *forum non conveniens* doctrine. Dkt. Nos. 228 at 19–20, 232 at 23. And third, the balance of hardships tips in favor of dismissal because (i) the Khrapunovs are purportedly unable to travel to New York to participate in trial in person—with Viktor Khrapunov seeking

political asylum in Switzerland and thus barred from international travel under Swiss law and Ilyas Khrapunov unwilling to leave Switzerland for fear of potential arrest and extradition to Kazakhstan—and (ii) there is extensive litigation underway in Switzerland involving many of the same parties and related claims. Dkt. Nos. 228 at 20–22, 232 at 23–25.

▪▪ The Court, however, sees no basis to depart from its earlier conclusion that dismissal on *forum non conveniens* grounds is unwarranted here.

Even assuming *arguendo* that the Individual Defendants' offered concessions have rendered Switzerland an adequate alternative forum, the Court also grounded its original decision, as discussed above, on a determination that the Kazakh Entities' selection of this forum for their claims is entitled to substantial deference and that the balance of the competing interests is not " 'strongly in favor of the defendant," ' as generally required to disturb a plaintiff's legitimate choice of forum. *See* Dkt. No. 174 at 7–9, 12–19 (quoting *Gilbert*, 330 U.S. at 508, 67 S.Ct. 839). The Individual Defendants' only contention as to deference is the summary suggestion that the Kazakh Entities are clearly "comfortable" litigating in Switzerland, as evidenced by their involvement in related proceedings in that jurisdiction. But the Individual Defendants do not explain—and the Court fails to see—why the Kazakh Entities' purported "comfort" with separate proceedings taking place in Switzerland should impact the Court's findings that the Kazakh Entities' choice of this forum for the particular claims asserted here was motivated by legitimate reasons (the preexisting New York litigation initiated by the Chetrit Entities and the close linkage between that pending action and the real estate-based money laundering allegations central to the Kazakh Entities' claims) and that there is a bona fide connection between those claims and the New York forum (because the Individual Defendants and Triadou allegedly laundered stolen funds through New York City real estate projects). The Individual Defendants' argument raises no specter that the Kazakh Entities' assertion of their claims was driven by forum-shopping or some other improper purpose, and accordingly, it does not bear on the deference owed to the Kazakh Entities' forum selection.

As for the balance of the hardships, the Khrapunovs' proffered inability or unwillingness to travel from Switzerland to participate personally in trial does not alter the bottom line of the Court's calculus at this stage of the proceedings. The Kazakh Entities themselves brought to the Court's attention long before its June 21 Decision on Triadou's *forum non conveniens* argument that the Khrapunovs resided in Switzerland, that they faced multiple charges in Kazakhstan, that Kazakhstan had sought assistance from Swiss authorities in its ongoing efforts to prosecute the Khrapunovs, and that Viktor Khrapunov, at least, was the subject of a formal extradition request. *See, e.g.*, Dkt. Nos. 49 ¶¶ 84–85, 174 at 10, 13. The Court was further aware at the time of the June 21 Decision that Ablyazov was incarcerated in France. Dkt. No. 174 at 10. To be sure, Triadou did not—as the Khrapunovs now do—specifically identify any witnesses "who would be unable or unwilling to appear to New York." *Id.* at 15 (internal quotation marks and citation omitted). But the Court, in denying Triadou's dismissal motion, accounted for the possibility that, for example, "letters rogatory" might have to "be used to obtain some witness testimony in New York." *Id.* And it nevertheless concluded, in light of the presence in New York of Chetrit-affiliated witnesses and the short-notice appearance of a number of critical Swiss witnesses for live participation in the May 2016 hearing, that the

ability to "obtain live witness testimony does not weigh strongly one way or the other." *Id.* at 14–15 (internal quotation marks and citation excluded).

That is not to minimize the Khrapunovs' stated interest in possibly offering live testimony at trial. Dkt. No. 232 at 23–24. Indeed, the Court is mindful that "[t]here is a strong preference for live testimony" in the context of any *forum non conveniens* analysis, and that is particularly true when fraud claims potentially turning on factfinders' assessments of demeanor and credibility are at issue. *See, e.g., Flynn v. Nat'l Asset Mgmt. Agency*, 42 F.Supp.3d 527, 538 n.54 (S.D.N.Y. 2014) (citing *Iragorri*, 274 F.3d at 75); *see also Alfadda v. Fenn*, 159 F.3d 41, 47–48 (2d Cir. 1998).

At the same time, the Court of Appeals has recognized that "[d]espite the preference for live testimony" alternative arrangements, such as "videotaped depositions, obtained through letters rogatory," can still "afford the jury an opportunity to assess the credibility" of absent witnesses. *DiRienzo v. Philip Servs. Corp.*, 294 F.3d 21, 30 (2d Cir. 2002). District courts have concluded accordingly that prejudice flowing from the inability of foreign parties to travel to the appointed forum may often be substantially ameliorated—or at least mitigated—by, for example, testimony by videoconference or deposition. *See, e.g., In re Bernard L. Madoff Inv. Secs. LLC*, 525 B.R. 871, 891 (Bankr. S.D.N.Y. 2015); *see also In re Lernout & Hauspie Sec. Litig.*, 208 F.Supp.2d 74, 93 (D. Mass. 2002) (were litigants to encounter problems persuading

third-party witnesses facing criminal investigations abroad to appear in the United States, "sufficient alternative arrangements, such as videotaped depositions obtained through letters rogatory, can be used"); *cf. Eclaire Advisor Ltd. v. Daewoo Engineering & Constr. Co. Ltd.*, 375 F.Supp.2d 257, 265 (S.D.N.Y. 2005) ("In this day and age of rapid transportation and instant communications, the convenience of immediate physical proximity to documents, testimony, and other proof has become of less consequence to a *forum non conveniens analysis* ... "). The Kazakh Entities urge that just these sorts of options are likely available should the Khrapunovs desire to testify in person, Dkt. No. 241 at 39–40—a suggestion that the Khrapunovs do not rebut, or even acknowledge, on reply.[3] Left to conclude, then, that the Khrapunovs could—if they were to so choose—avail themselves of some alternative manner of testifying at trial, the Court finds that Khrapunovs' stated unwillingness or inability to appear in New York is not enough to carry the Individual Defendants' burden of demonstrating that private interests "strongly" favor dismissal of this action from the Kazakh Entities' legitimately chosen forum.

Nor, finally, do references to purportedly "exten[sive]" related proceedings in Switzerland involving the Individual Defendants, Almaty, and Kazakhstan more broadly counsel a different conclusion on the third prong of the *forum non conveniens* analysis. Dkt. Nos. 228 at 21–22, 232 at 24–25. Preliminarily, as with the Indi-

**3.** Of some note on this point, the Honorable Katharine H. Parker, to whom the undersigned has referred this matter for general pretrial supervision, recently opined that Hague Convention procedures—albeit potentially cumbersome—would provide adequate means for taking Ilyas Khrapunov's deposition in Switzerland and that the parties would be able to secure a verbatim transcript of the proceedings, but permitted the Kazakh

Entities to apply for additional compulsory testimony in a different forum should the procedures available in Switzerland prove ineffective. Dkt. No. 330 at 11–12. This Court later issued Hague Convention Requests for International Judicial Assistance to facilitate the Kazakh Entities' depositions of Ilyas & Viktor Khrapunov in Switzerland. Dkt. No. 391.

vidual Defendants' legal and residential circumstances, the Court was aware when it rejected Triadou's original *forum non conveniens* arguments that, for example, the Kazakh Entities were "already involved in multiple Swiss proceedings." Dkt. No. 91 at 2 n.2, 8 n.17. More importantly, "the existence of related litigation ... is not listed as a relevant factor in the *forum non conveniens* analysis laid out *Gilbert*," and is generally relevant only when "the parties to the American and foreign actions [are] identical and there [is] likelihood of significant duplication of legal efforts on behalf of all the parties." *Guidi v. Inter–Continental Hotels Corp.*, 224 F.3d 142, 148 (2d Cir. 2000) (internal quotation marks and citation omitted). That is not the case here. As the Kazakh Entities point out, no evidence has been put before the Court that would indicate that there is any proceeding currently pending in Switzerland that involves all of the parties to this action—or, for that matter, any proceeding at all involving BTA. Dkt. No. 241 at 42. The Kazakh Entities are also correct in noting that there is no indication that this litigation could readily be joined, consolidated, or otherwise meaningfully coordinated with any such Swiss action to facilitate realization of the efficiency benefits of a dismissal that the Individual Defendants purport to envision. *Id.* Furthermore, no evidence has been submitted suggesting that any Swiss tribunal could issue a restraint or judgment against the property of the Individual Defendants allegedly present in New York and targeted by the Kazakh Entities—a consideration analogous to one recently emphasized by the Ninth Circuit in reversing a California district court's dismissal on *forum non conveniens* grounds of a similar suit brought by Almaty against members of the Khrapunov family. *See, e.g.*, *City of Almaty v. Khrapunov*, 685 Fed.Appx. 634, 636–37 (9th Cir. 2017) (Summary Order) ("the district court failed to consider whether a judgment against Defendants could be enforced in Switzerland"). And finally, to the extent that the Individual Defendants highlight in passing that proceeding in Switzerland carries convenience benefits because claim development and discovery has progressed "substantial[lly]" in the actions apparently pending in that forum, Dkt. Nos. 228 at 21–22; 232 at 24–25, the Court simply notes that this action has itself been ongoing for over two years, featuring live hearing testimony and judicial factfinding on injunction and attachment motions, approximately a year of discovery including the issuance of several letters rogatory, and hundreds of pages' worth of substantive decisions of this Court and the United States Magistrate Judge in her diligent supervision of discovery. This litigation, too, has been "substantial," and the time for concerns about duplication of efforts is past. The Court simply does not view vague invocations of the relative progress of the foreign actions as requiring dismissal of the instant suit at this at least modestly advanced stage of the proceedings.

For all of these reasons, the Individual Defendants' motion to dismiss on *forum non conveniens* grounds is denied.

### 2. Viability of State Law Claims Under Rule 12(b)(6)

The Individual Defendants also argue that several of the Kazakh Entities' individual state law claims should dismissed under Federal Rule of Civil Procedure 12(b)(6). Specifically, they contend that the Kazakh Entities fail to state claims for actual fraudulent conveyance (Count 6 of the Amended Crossclaims), for constructive fraudulent conveyance (Count 7), for unjust enrichment (Count 8), for common law conversion (Count 9), for constructive trust (Count 10), under Section 5239 of the New York Civil Practice Law and Rules (the "CPLR") (Count 11), and for recognition and enforcement of a foreign judg-

ment under CPLR Section 5303 (Count 12), and that the conversion, unjust enrichment, and constructive trust claims are time-barred. The Court will address the Individual Defendants' arguments concerning the sufficiency of the Kazakh Entities' pleading one Count at a time and will then separately address arguments implicating the statute of limitations.

### a. Legal Standard Under Rule 12(b)(6)

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* at 678, 129 S.Ct. 1937 (quoting *Twombly*, 550 U.S. at 556–57, 127 S.Ct. 1955) (internal quotation marks and citation omitted).

In deciding a motion to dismiss, a court is required to "accept[ ] the complaint's factual allegations as true and draw[ ] all reasonable inferences in the plaintiff's favor." *Steginsky v. Xcelera, Inc.*, 741 F.3d 365, 368 (2d Cir. 2014). It should not, however, give "effect to legal conclusions couched as factual allegations." *Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*, 507 F.3d 117, 121 (2d Cir. 2007).

### b. Sufficiency of Allegations Supporting Actual and Constructive Fraudulent Conveyance Claims Under Rule 12(b)(6) (Counts 6 and 7)

The Kazakh Entities assert claims for actual fraudulent conveyance and constructive fraudulent conveyance under the New York Debtor Creditor Law ("DCL") §§ 275, 276, 279, 273, and 273–a. Dkt. No. 219 ¶¶ 162–173. Both claims are premised on the central allegation that the 2014 assignments of Triadou's (and thus, purportedly, the Individual Defendants') interests in the Flatotel and Cabrini Medical Center to the Chetrit Entities were made in exchange for below-market consideration and in fact "represented a value significantly below the fair value of [those] interest[s]." *Id.* They were executed, the Kazakh Entities aver, at a time when Triadou—as, allegedly, an alter ego of the Individual Defendants—had liabilities current and/or future liabilities to the Kazakh Entities in the form of the U.K. Judgments and the claims pending in California federal court. *Id.*

The statutory provisions invoked by the Kazakh Entities "define several types of conveyances by a debtor as fraudulent, and thus recoverable by creditors." *Am. Fed. Title Corp. v. GFI Mgmt. Servs., Inc.*, 126 F.Supp.3d 388, 400 (S.D.N.Y. 2015). Under DCL Section 276, for example:

> Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors.

DCL § 276. "To survive a motion to dismiss on a § 276 claim, a plaintiff must allege that a defendant acted with actual intent to hinder, delay, or defraud creditors and must plead its allegations with particularity as required by Fed. R. Civ. P.

9(b)." *Tommy Lee Handbags Mfg. Ltd. v. 1948 Corp.*, 971 F.Supp.2d 368, 382 (S.D.N.Y. 2013).

▮▮▮ By contrast, constructive "fraudulent conveyances under DCL §§ 273 and 273–a are defined exclusively by the objective conditions of the asset transfer at issue, without regard to the debtor's intent in making the transfer." *GFI*, 126 F.Supp.3d at 400. Put differently, "[t]hese conveyances need not be intentionally harmful to creditors; it is the effect of the transfers alone, and not their purpose, that renders them constructively fraudulent." *Id.* at 400–401. A conveyance is constructively fraudulent under Section 273 if it "lacks 'fair consideration' and the debtor 'is or will be thereby rendered insolvent.'" *Id.* at 400 (quoting DCL § 273). Section 273–a, for its part, renders constructively fraudulent a transfer by debtor that "lacks 'fair consideration'" when "the debtor 'is a defendant in an action for money damages' and ultimately 'fails to satisfy the [resulting final] judgment.'" *Id.* (brackets in original) (quoting DCL § 273–a).

DCL Section 275 similarly provides:

Every conveyance made and every obligation incurred without fair consideration when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors.

DCL § 275. To state a claim under Section 275, a plaintiff must allege both a "lack of fair consideration" and that "the Defendant intended or believed that it would incur debts beyond its ability to pay when the debts matured." *SungChang Interfashion Co., Ltd. v. Stone Mountain Accessories, Inc.*, No. 12-CV-7280(ALC), 2013 WL 5366373, at *10 (S.D.N.Y. Sept. 25, 2013).

The Individual Defendants do not distinguish between these claims in advancing what is essentially their only argument in support of dismissal: that because it is not alleged that Ablyazov or the Khrapunovs were personally party to the assignments of Triadou's real estate interests, whether as transferors or transferees, they cannot be held liable for fraudulent conveyance. Dkt. Nos. 228 at 13–14, 232 at 21–22.

▮▮▮ It is generally true that "New York law does not recognize 'a creditor's remedy for money damages against parties who ... were neither transferees of the assets nor beneficiaries of the conveyance.'" *See, e.g., Roselink Inv'rs, L.L.C. v. Shenkman*, 386 F.Supp.2d 209, 226–27 (S.D.N.Y. 2004) (quoting *F.D.I.C. v. Porco*, 75 N.Y.2d 840, 842, 552 N.Y.S.2d 910, 552 N.E.2d 158 (1990)); *see also SungChang*, 2013 WL 5366373, at *11 (where individual defendants were not alleged to be "transferor, transferee, or beneficiary of the transfer," there was "no direct theory of liability for any fraudulent conveyance claim" as to them). As the Kazakh Entities point out, however, Dkt. No. 241 at 27, they may—at least in theory—proceed against the Individual Defendants under a corporate veil-piercing theory. *See, e.g., D'Mel & Assocs. v. Athco, Inc.*, 105 A.D.3d 451, 963 N.Y.S.2d 65, 66–67 (2013) (individual executives of debtors "who were not transferees of either conveyance" could not "be held liable without piercing the corporate veil unless they benefited from the conveyances"); *SungChang*, 2013 WL 5366373, at *11–12 (permitting fraudulent conveyance claims against individual executive of corporation that engaged in purportedly sham asset sale to proceed based on veil-piercing theory); *NPR, LLC v. Met. Fin. Mgmt., Inc.*, 63 A.D.3d 1128, 882 N.Y.S.2d 253, 254 (2009) (affirming veil piercing as to individual associated with transferee corporation in fraudulent conveyance action).

 Under New York law,[4] "those seeking to pierce a corporate veil . . . bear a heavy burden." *TNS Holdings v. MKI Sec. Corp.*, 92 N.Y.2d 335, 339, 680 N.Y.S.2d 891, 703 N.E.2d 749 (1998). Specifically, a "plaintiff seeking to pierce the corporate veil must demonstrate that a court in equity should intervene because the owners of the corporation exercised complete domination over it in the transaction at issue and, in doing so, abused the privilege of doing business in the corporate form, thereby perpetrating a wrong that resulted in injury to the plaintiff." *E. Hampton Union Free Sch. Dist. v. Sandpebble Bldrs., Inc.*, 66 A.D.3d 122, 884 N.Y.S.2d 94, 98 (2009). "Factors to be considered in determining whether the owner has abused the privilege of doing business in the corporate form include whether there was a failure to adhere to corporate formalities, inadequate capitalization, commingling of assets, and use of corporate funds for personal use." *Id.* at 99 (internal quotation marks and citations omitted).

Notwithstanding this ultimate evidentiary burden, New York courts have recognized that a veil-piercing theory often necessitates a "fact laden inquiry" and thus is "unsuited for resolution on a pre-answer, pre-discovery motion to dismiss." *Holme v. Glob. Minerals & Metals Corp.*, No. 600232/08, 22 Misc.3d 1123A, 880 N.Y.S.2d 873, 2009 WL 387034, at *7 (N.Y. Sup. Ct. Jan. 12, 2009) (citing, *inter alia*, *Ledy v. Wilson*, 38 A.D.3d 214, 831 N.Y.S.2d 61, 62 (2007) ("a fact-laden claim to pierce the corporate veil . . . is particularly unsuited for resolution on summary judgment") (internal quotation marks omitted)). Accordingly, while it is generally " 'not sufficient, at the pleading stage, to make conclusory allegations of control,' "

" 'setting forth some examples of alleged domination may provide sufficiently specific factual allegations to support an alter ego claim and result in denial of the motion to dismiss.' " *SungChang*, 2013 WL 5366373, at *11 (quoting *In re Sunbeam Corp.*, 284 B.R. 355, 366 (Bankr. S.D.N.Y. 2002)).

 Although discovery may yield a different result, the Kazakh Entities have pled sufficient facts on this front for their fraudulent conveyance claims as to the Individual Defendants to survive a motion to dismiss on a veil-piercing theory. The Amended Crossclaims allege that Ilyas Khrapunov, along with Belgium-based real estate fund manager Nicolas Bourg, founded Triadou on behalf of the Individual Defendants in approximately 2011 specifically in order "to mask the Ablyazov–Khrapunov Group's efforts to invest in real estate opportunities in the U.S." Dkt. No. 219 ¶¶ 85–86. They further assert that Triadou was, from its inception, "wholly owned and controlled by SDG, which was itself a front of the Ablyazov–Khrapunov Group's Activities," and that Bourg served as the sole director of Triadou, "operating at the direction of the Ablyazov–Khrapunov Group, who continued to control SDG, Triadou's sole shareholder." *Id.* ¶¶ 85–87. In addition, the Kazakh Entities allege at some length that Ilyas Khrapunov, again acting on behalf of the Individual Defendants, conceived of and directly negotiated and otherwise facilitated Triadou's investments into the Flatotel and Cabrini Medical Center (on terms unfavorable to Triadou itself), and that these investments were funded not by Triadou's monies but rather by Individual Defendant-directed transfers from Telford's accounts with

4. Based on the authorities cited in their briefs, the parties appear to be in agreement, if implicitly, that New York law should govern any veil-piercing inquiry, and "where the parties have agreed to the application of the forum law, their consent concludes the choice of law inquiry." *Am. Fuel Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130, 134 (2d Cir. 1997).

FBME, which consisted of Ablyazov's ill-gotten gains and were controlled by Ablyazov and Ilyas Khrapunov. *See, e.g., .id.* ¶¶ 88–92, 97–106, 111–113. They assert, moreover, that Ilyas Khrapunov personally directed Triadou to liquidate its holdings in the Flatotel and Cabrini Medical Center "as quickly as possible" in order to remove the Individual Defendants' purportedly ill-gotten funds from the United States, and that Triadou accordingly executed the assignments cited in the fraudulent conveyance claims on roundly unfavorable, below-market terms. *Id.* ¶¶ 114–122. More broadly, the Kazakh Entities allege that Triadou, as a general matter, is itself "insolvent," holding "no funds or other assets of its own," and instead "relies on funding from other Ablyazov–Khrapunov Group entities, such as Telford, to meet its obligations." *Id.* ¶ 170. In the Court's view, such allegations are sufficient to support a veil-piercing theory of liability as to the Individual Defendants at this stage of the litigation. Accordingly, the Individual Defendants' motions to dismiss Counts 6 and 7 are DENIED.

### c. Sufficiency of Allegations as to Unjust Enrichment Claim (Count 8)

The Kazakh Entities also plead a claim of unjust enrichment, which centers on allegations that the Individual Defendants embezzled funds from the Kazakh Entities and then invested those funds, acquiring assets in the United States unjustly. *Id.* ¶¶ 174–76.

▪ A claim for unjust enrichment must allege that "(1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover." *Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 306 (2d Cir. 2004). The Individual Defendants argue that the claim is not sufficiently pled because it fails to allege that the Khrapunovs or Ablyazov received any direct benefit from the investments. Dkt. Nos. 228 at 15–16, 232 at 21.

▪ The Court cannot agree. The Amended Crossclaims contain numerous allegations suggesting that the Individual Defendants directly benefitted from the alleged embezzlement and fraud. For example, the Ablyazov–Khrapunov Group is said to have used SDG and Telford and Triadou to make real estate investments in the United States precisely because the Individual Defendants believed the stolen funds would then "be difficult for Kazakh authorities to access." Dkt. No. 219 ¶¶ 77–78, 87–88. The inference here, plausibly drawn in the Crossclaim Plaintiffs' favor, is that they wanted to "secret the families' illicit wealth" in order to ultimately return the laundered funds to the Individual Defendants. *Id.* ¶ 77; Dkt. No. 241 at 24. This benefit would accrue to each individual defendant. Moreover, as the Kazakh Entities note in their brief, the Individual Defendants also directly benefitted from the allegedly stolen assets in that they used these funds to fight their legal battles, including by purportedly hiring hackers to surveil French officials in the hopes of freeing Ablyazov. Dkt. No. 241 at 24 (citing Dkt. No. 219 ¶¶ 73–76). The Individual Defendants' motion to dismiss Count 8 is DENIED.

### d. Sufficiency of Allegations as to Common Law Conversion Claim (Count 9)

The Kazakh Entities plead a claim of conversion in Count 9 of the Amended Crossclaims. The gravamen of the claim is their assertion that the Individual Defendants bought and sold assets obtained with funds derived from the corruption of Viktor Khrapunov as mayor of the City of

Almaty, and of Ablyazov as Chairman of BTA Bank. Dkt. No. 219 ¶¶ 178–180.

 Under New York law, conversion is "the unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights." *Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 403–04 (2d Cir. 2006) (quoting *Vigilant Ins. Co. of Am. v. Hous. Auth.*, 87 N.Y.2d 36, 44, 637 N.Y.S.2d 342, 660 N.E.2d 1121 (1995)). "In order to maintain an action for conversion, a plaintiff must demonstrate (1) plaintiff's legal ownership or immediate superior right of possession to property; and (2) defendant's unauthorized interference with plaintiff's ownership or possession of such property." *Republic of Liberia v. Bickford*, 787 F.Supp. 397, 402 (S.D.N.Y. 1992).

The arguments made to dismiss this count on insufficiency grounds are scant. Viktor Khrapunov argues that the Kazakh Entities "have not made any non-conclusory allegations that Viktor had any role in converting proceeds after 2004," an argument that essentially concedes that, putting aside the statute of limitations issue, the allegations dated prior to 2004 are sufficient. Dkt. No. 232 at 21. Ablyazov raises no arguments as to the sufficiency of the pleadings on Count 9.[5]

 Kazakh Entities have sufficiently stated a claim for conversion. They allege that none of the Defendants has a superior interest in the assets allegedly stolen, Dkt. No. 219 ¶ 178, and the Individual Defendants do not argue otherwise. They plead detailed allegations of Ablyazov and Viktor Khrapunov's embezzlement schemes. *Id.* ¶¶ 28–61. And they make allegations that funds stolen from the Kazakh Entities have been within the Individual Defendants' dominion by way of the various entities they purportedly control: Telford, SDG, and Triadou. Dkt. No. 219 ¶¶ 78–79,

86. These allegations are sufficient to survive a motion to dismiss pursuant to Rule 12(b)(6).

### e. Sufficiency of Allegations as to Constructive Trust Claim (Count 10)

The Kazakh Entities seek a constructive trust over the 50% interest in CF 135 West Member LLC assigned by Triadou to prevent "further dissipation of the funds" resulting from the alleged breach of fiduciary duty owed by Viktor Khrapunov to the City of Almaty. Dkt. No. 219 ¶¶ 182–84. Alternatively, the Kazakh Entities argue that the conspiracy to fraudulently transfer Triadou's interest in the Flatotel "justifies imposition of a constructive trust to prevent any further transfers or encumbrances of this property." *Id.* ¶ 185.

 Generally, New York law requires a plaintiff establish four elements before a court will impose a constructive trust: "(1) a confidential or fiduciary relation, (2) a promise, (3) a transfer in reliance thereon and (4) unjust enrichment." *Sharp v. Kosmalski*, 40 N.Y.2d 119, 121, 386 N.Y.S.2d 72, 351 N.E.2d 721 (1976). However, it is clear that not all elements need to be met for the court to impose a constructive trust, as the factors are merely guideposts and are not rigidly applied. *In re Koreag, Controle et Revision S.A. v. Refco F/X Assoc., Inc. (In re Koreag)*, 961 F.2d 341, 352 (2d Cir. 1992).

With respect to constructive trust claim, the arguments the Individual Defendants offer for dismissal differ by individual. Ablyazov offers four reasons why the claim should be dismissed as to him. Dkt. No. 228 at 17. Viktor Khrapunov offers one. Dkt. No. 232 at 21. The Court addresses them in turn.

---

5. He only asserts that it is time-barred. Dkt. No. 228 at 15.

First, Ablyazov asserts that the claim should fall because it includes no allegations that he can provide the requested relief. Dkt. No. 228 at 17. The Kazakh Entities allege that "the Telford accounts consisted of Ablyazov's stolen funds, Ilyas Khrapunov conferred with Ablyazov regarding investments of funds from Telford, and Ablyazov's approval was required for transfers from Telford," and that the Telford accounts were purportedly used to fund the Flatotel deal. Dkt. No. 219 ¶¶ 102–06. As such, it is plausible that a constructive trust could prevent any further transfers of the allegedly stolen property.

Second, Ablyazov argues that the constructive trust claim is derivative of the unjust enrichment claim. Dkt. No. 228 at 17. Given the Court's above decision that the unjust enrichment claim is sufficiently pleaded, this argument is plainly unavailing.

Third, Ablyazov claims that the Kazakh Entities fail to allege any "confidential or fiduciary relationship" of which he was a part, thus failing to satisfy one element of the claim. *Id.* As the Kazakh Entities note, this forgets Ablyazov's position as Chairman of BTA Bank, during which time he undoubtedly was its fiduciary. Dkt. 241 at 25.

Fourth, and finally, Ablyazov argues that he is not an appropriate defendant for the constructive trust claim, as the trust "would be properly directed to the entity holding the assets, *i.e.*, the Chetrit Group." Dkt. No. 247 at 2–3. However, the Amended Crossclaims allege that Ablyazov controls Telford and that Telford's assets include stolen funds, thus the constructive trust claim is also properly directed towards him. Dkt. No. 219 ¶¶ 77–78, 98.

For his part, Viktor Khrapunov argues that he "is not plausibly alleged to have received any benefit from the real estate investments or to have had any involvement in money laundering generally or with the alleged New York transactions." Dkt. No. 232 at 21. As stated above with respect to the sufficiency of the unjust enrichment claim, *see supra* Part II.C.2.C, the allegations of the Amended Crossclaims allow for the plausible inference that Viktor Khrapunov benefitted from the real estate investments, even if, as discussed below with respect to personal jurisdiction, *see infra* Part II.C.3, his personal connection to the real estate activities remains ill-defined. The allegations are sufficient to support a claim for constructive trust at this early stage.

### f. Sufficiency of Allegations as to CPLR § 5239 Claim (Count 11)

Count 11 of the Amended Crossclaims asserts a claim against "All Defendants" under CPLR § 5239. Dkt. No. 219 ¶¶ 187–91. Pursuant to that provision, an interested party may commence a special proceeding to determine disputed rights in property or debt that is otherwise subject to some post-judgment collection. N.Y. CPLR § 5239.

The gravamen of the Kazakh Entities' Section 5239 claim is that Triadou has filed "serial actions" in New York state courts seeking payment on the (purportedly fraudulent) 2014 assignment agreements between Triadou and the Chetrit Entities and has been awarded summary judgment in at least some of those actions. Dkt. No. 219 ¶¶ 187–91. The Kazakh Entities allege that they are "the rightful owners of Triadou's interest in the Flatotel and Cabrini Medical Center and/or any funds derived from the sale of that interest" and request, accordingly, that the Court "set aside any judgment in Triadou's favor … direct that Triadou's interest in the Flatotel and Cabrini Medical Center be transferred to [the Kazakh Entities]," and award the Kazakh

Entities statutorily permitted attorneys' fees. *Id.*

The Individual Defendants argue that this claim—notwithstanding its label—is substantially directed only at Triadou. Indeed, they observe, correctly, that Count 11 does not "seek any relief against [the Individual Defendants]" and that Amended Crossclaims do not "allege any judgment in the [Individual Defendants'] favor that could be set aside." Dkt. Nos. 228 at 18; 232 at 22. In response, the Kazakh Entities acknowledge that they currently "are only aware of New York judgments in favor of Triadou," but assert, without citation or further explanation, that "Ablyazov and the Khrapunovs may be in possession of property disposed by those judgments," and, to the extent that "discovery reveals that they have such property," Count 11 is viable as to the Individual Defendants. Dkt. No. 241 at 27–28.

■ The Court is aware of no authority, and the Kazakh Entities provide none, for permitting a claim to go forward based on what is essentially a speculative hypothetical unmoored from the allegations set forth in the Amended Crossclaims. To the extent that discovery on the Kazakh Entities' remaining claims identifies a good-faith factual basis for a Section 5239 claim against the Individual Defendants, the Kazakh Entities are, of course, free to bring a motion to amend supported by a showing of good cause. As currently pled however, that claim must be dismissed as to the Individual Defendants. Accordingly, the motions to dismiss Count 11 as to the Individual Defendants are GRANTED.

### g. Sufficiency of Allegations as to CPLR § 5303 Claim for Recognition and Enforcement of a Foreign Judgment (Count 12)

The Kazakh Entities' Amended Crossclaims also assert a claim against Ablyazov under Section 5303 of the CPLR, seeking to enforce the U.K. Judgments in the U.S. Dkt. No. 219 ¶¶ 192–199. Sections 5203 and 5303 of the CPLR together provide that a "foreign country judgment" that is "final, conclusive, and enforceable where rendered" is "conclusive between the parties to the extent that it grants or denies recovery of a sum of money" and is "enforceable by an action on the judgment, a motion for summary judgment in lieu of complaint, or in a pending action by counterclaim, cross-claim or affirmative defense." N.Y. CPLR §§ 5302–5303.

The Individual Defendants' sole passing challenge to this claim is a somewhat curious one-sentence "adoption" of arguments made by Triadou in its independent objections to the Amended Crossclaims. Dkt. No. 228 at 19. As advanced by Triadou, the pertinent argument is that the Kazakh Entities' Section 5303 claim contains a paragraph inappropriately alleging that "Triadou is the alter ego of the Ablyazov–Khrapunov group, and is thus liable for the all current and future obligations against the Ablyazov–Khrapunov group." Dkt. Nos. 219 ¶ 199; 223. According to Triadou, that single allegation constitutes an end-run around the Court's August 26, 2016 Order—discussed above—limiting the Kazakh Entities' amendments to matters relating "solely" to their claims or allegations against the Individual Defendants. Dkt. No. 223 at 2. Separately, Triadou maintains, the allegation improperly attempts to revive a freestanding "alter ego" claim previously dismissed as unrecognized (at least as an independent cause of action) by New York law. *Id.* at 3 (citing Dkt. No. 174 at 28–29).

As the Kazakh Entities correctly note in opposing the Individual Defendants' motions here, these arguments as made by Triadou do not bear in any way on the viability of the Kazakh Entities' judgment recognition and enforcement claim as to

*Ablyazov* (the only Defendant directly targeted by the claim). Dkt. 241 at 22–23. Because the Individual Defendants' motion to dismiss that claim relies entirely upon those arguments, it must be DENIED.

Independently, however, the Court will GRANT *Triadou's* longstanding application to strike paragraph 199 of the Amended Crossclaims. Dkt. No. 225. Regardless of whether the allegations in that paragraph are inappropriate as an attempted "revival" of the alter ego claim, they most assuredly do not relate "solely" to the Individual Defendants—insofar as they assert that Triadou is liable for their debts—and therefore violate the Court's August 26, 2016 limiting order.

### h. Timeliness of Conversion, Unjust Enrichment and Constructive Trust Claims

In addition to attacks on the sufficiency of the Kazakh Entities' claims for conversion, unjust enrichment, and constructive trust, the Individual Defendants' motion to dismiss also asserts that are three claims all time-barred. Dkt. No. 232 at 17. This argument rests on three premises: 1) New York's statute of limitations for conversion is three years; 2) the alleged theft or embezzlement by both the Khrapunovs and Ablyazov happened no later than 2007 or 2009, respectively; and 3) the unjust enrichment and constructive trust claims are simply conversion claims of another name, are premised on the same alleged conduct, and so are subject to the same statute of limitations.[6] *Id.* at 17–20; Dkt. No. 228 at 15–18.

The Kazakh Entities counter by arguing that the statutes of limitations for each of the three claims only begins to run at the time at which the Individual Defendants "directed their conduct into New York,

which did not occur until late 2012 at the earliest." Dkt. No. 241 at 28. That is, it was only at "the moment it was possible [for the Court] to obtain personal jurisdiction over the [Individual Defendants]," that the statutes began to run. *Id.* at 30.

The Khrapunovs argue, for the first time in their reply brief, that even if the statute of limitations does not accrue while the Individual Defendants are outside of the country and not subject to personal jurisdiction, New York's borrowing statute requires the Court to apply the shorter of New York's limitation period or the limitations period of the place in which the cause of action accrued. Dkt. No. 246 at 7 (citing N.Y. C.P.L.R. § 202). Because this argument was first raised in the reply, Kazakh Entities have not had a chance to rebut.

The threshold question in deciding this issue is: where and when do the actions accrue? First, with respect to conversion, "[u]nder New York law, conversion claims are subject to a three-year statute of limitations, which begins running when the alleged conversion takes place." *Mosdos Chofetz Chaim, Inc. v. RBS Citizens, N.A.*, 14 F.Supp.3d 191, 209 (S.D.N.Y. 2014) (citation omitted). There is one exception to this rule for when possession is originally lawful, but this "has no application in a case where the lawful custodian of property commits an overt and positive act of conversion by an unlawful sale or disposition of the same." *Regions Bank v. Wieder & Mastroianni, P.C.*, 526 F.Supp.2d 411, 414 (S.D.N.Y. 2007) (quoting *MacDonnell v. Buffalo Loan, Tr. & Safe Deposit Co.*, 193 N.Y. 92, 101, 85 N.E. 801 (1908)), *aff'd*, 268 Fed.Appx. 17 (2d Cir. 2008). "Where an owner pursues the party who took his property, the three-

---

**6.** The Court need not reach whether the unjust enrichment and constructive trust claims should be treated as conversion claims and subject to a three year statute of limitations because it would not affect the outcome here. *See infra* (discussing the operative dates of conduct and the effect of the borrowing statute).

year period begins to run when the property was taken." *DeWeerth v. Baldinger*, 836 F.2d 103, 106 (2d Cir. 1987) (citing *Sporn v. MCA Records, Inc.*, 58 N.Y.2d 482, 487–88, 462 N.Y.S.2d 413, 448 N.E.2d 1324 (1983)).

■ Second, with respect to unjust enrichment, the statute of limitations begins to run "upon an occurrence of the wrongful act giving rise to a duty of restitution." *Golden Pac. Bancorp v. Fed. Deposit Ins. Corp.*, 273 F.3d 509, 520 (2d Cir. 2001) (internal citations and quotation marks omitted). The claim accrues as soon as the unjust enrichment occurs, even if the increase in wealth is unrealized or illiquid. *JPMorgan Chase Bank, N.A. v. Maurer*, No. 13-CV-3302(NRB), 2015 WL 539494, at *6 (S.D.N.Y. Feb. 10, 2015). New York courts have held that claims for unjust enrichment "are governed by either a three-year statute of limitations when monetary relief is sought or a six-year statute of limitations when equitable relief is sought." *Grynberg v. Eni S.p.A.*, No. 06-CV-6495(RLC), 2007 WL 2584727, at *3 (S.D.N.Y. Sept. 5, 2007). Kazakh Entities suggest the six-year statute of limitations is applicable here, while the Individual Defendants claim the three-year limit applies. Dkt. No. 241 at 30; Dkt. No. 228 at 16. The Court need not decide which statute applies here, because even if it were six years, more than six years elapsed between the latest alleged embezzlement (February 2009), and when Plaintiffs filed their crossclaims (October 2015). Dkt. No. 228 at 16.

■ Third, "a cause of action to impose a constructive trust is governed by a six-year statute of limitations and begins to accrue 'upon the occurrence of the wrongful act giving rise to a duty of restitution

and not from the time the facts constituting the fraud are discovered.'" *Reiner v. Jaeger*, 50 A.D.3d 761, 855 N.Y.S.2d 613, 614 (2008) (quoting *Soscia v. Soscia*, 35 A.D.3d 841, 829 N.Y.S.2d 543 (2006) and C.P.L.R. § 213); *accord Garson v. Garson*, No. 16-CV-6167(KPF), 2017 WL 2915386, at *4 (S.D.N.Y. July 6, 2017).

■ In the case of all three claims, then, the causes of action accrued when the allegedly wrongful acts of embezzlement occurred, no later than 2009 in the case of Ablyazov, and no later than 2007 in the case of Viktor Khrapunov. Dkt. No. 219 ¶¶ 28–33, 45–55, 62. Moreover, it is undisputed that all three causes of action arose in Kazakhstan, the locus of the predicate wrongful conduct.

The Kazakh Entities are correct when they argue that "the statute of limitations on any action that accrues while the defendant is out of New York does not begin to run until he or she comes into the state." Dkt. No. 241 at 29 (citing N.Y. C.P.L.R. § 207). However, as noted above, they forget New York's "borrowing statute," which states:

> An action based upon a cause of action accruing without the state cannot be commenced after the expiration of the time limited by the laws of either the state or the place without the state where the cause of action accrued, except that where the cause of action accrued in favor of a resident of the state the time limited by the laws of the state shall apply.

N.Y. C.P.L.R. § 202.[7]

■ When a nonresident sues on a cause of action accruing outside New York, the borrowing statute "requires the cause

---

**7.** Although the Kazakh Entities first raise the effects of the "borrowing statute" in their reply brief, the Individual Defendants should have been aware of its applicability as Triadou analogized to the statute's inquiry for determining where a cause of action accrued in its motion to dismiss. *See* Dkt. No. 257 at 11.

of action to be timely under the limitations periods of both New York and the jurisdiction where the cause of action accrued." *Global Fin. Corp. v. Triarc Corp.*, 93 N.Y.2d 525, 528, 693 N.Y.S.2d 479, 715 N.E.2d 482 (1999); *Dar El-Bina Eng'g & Contracting Co. v. Republic of Iraq*, 79 F.Supp.2d 374, 389 (S.D.N.Y. 2000). A cause of action "accrues" under CPLR § 202 "where the injury is sustained rather than where the defendant committed the wrongful acts." *Gordon & Co. v. Ross*, 63 F.Supp.2d 405, 408 (S.D.N.Y. 1999). "Where an alleged injury is purely economic, the place of injury usually is where the plaintiff resides and sustains the economic impact of the loss." *Global Fin. Corp.*, 93 N.Y.2d at 529, 693 N.Y.S.2d 479, 715 N.E.2d 482.

The Kazakh Entities represent that the applicable Kazakh statute of limitations is three years. Dkt. No. 246 at 7 (citing *Grynberg v. Giffen*, 119 A.D.3d 526, 989 N.Y.S.2d 103, 104 (2014). If the Kazakh Entities are correct, given the operative dates of the conduct, the application of the borrowing statute, and the respective New York and Kazakh statutes of limitations, all three state claims would be dismissed as time-barred. Because the Individual Defendants have not had a chance to rebut the Kazakh Entities' assertions with respect to the borrowing statute, or offer their own understanding of the applicable Kazakh statute of limitations, however, the Court reserves judgment on this argument pending supplemental briefing.

### 3. Personal Jurisdiction over the Khrapunovs

The Khrapunovs also move to dismiss the claims against them for lack of personal jurisdiction. To survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a prima facie showing that jurisdiction exists. *Licci v. Lebanese Canadian Bank*, 732 F.3d 161, 167 (2d Cir. 2013). On this procedural posture, the Court construes the pleadings and any supporting materials in the light most favorable to the plaintiffs, resolving any doubts in favor of jurisdiction. *Id.* The plaintiff may satisfy the requirement of a *prima facie* showing by providing an averment of facts that, if credited, would suffice to establish jurisdiction. *S. New Eng. Tel. Co. v. Global NAPs Inc.*, 624 F.3d 123, 138 (2d Cir. 2010) (citation omitted); *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990). The Court need not, however, accept a legally conclusory assertion or draw argumentative inferences. *Daventree Ltd. v. Republic of Azerbaijan*, 349 F.Supp.2d 736, 757 (S.D.N.Y. 2004) (internal quotation marks and citations omitted).

The Court must answer two questions in determining whether there is personal jurisdiction over a defendant: (1) whether there is jurisdiction under New York law; and (2) whether the exercise of jurisdiction would be consistent with federal due process requirements. *Grand River Enters. Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 165 (2d Cir. 2005). The Kazakh Entities do not suggest that the Court has general personal jurisdiction over the Khrapunovs, and the Court clearly does not, and so the present analysis focuses on specific personal jurisdiction.

### a) Plaintiffs Fail To Make Prima Facie Showing of Personal Jurisdiction over Viktor Khrapunov under New York Law

Under New York's "long arm statute," a court in New York may exercise personal jurisdiction "over any non-domiciliary...who in person or through an agent" does one of four enumerated things:

1. transacts any business within the state or contracts anywhere to supply goods or services in the state; or

2. commits a tortious act within the state, except as to a cause of action for

defamation of character arising from the act; or

3. commits a tortious act without the state causing injury to person or property within the state, except as to a cause of action for defamation of character arising from the act, if he

(i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or

(ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce; or

4. owns, uses or possesses any real property situated within the state.

N.Y. C.P.L.R. § 302(a).

With respect to each enumerated action, the Khrapunovs are correct that Viktor Khrapunov is not alleged to have *personally* transacted business in New York, committed a tort in New York, or used, owned, or possessed anything in New York. Dkt. No. 232 at 5–6. However, the New York statute also allows for personal jurisdiction by agency, and given the alleged conspiracy, discussed above, the Court must also consider the existence of agency jurisdiction over Viktor Khrapunov.

 New York courts have recognized that agency jurisdiction under § 302(a)(2) includes the so-called "conspiracy theory" of personal jurisdiction, which allows "the acts of a co-conspirator [to] be attributed to a defendant for the purpose of obtaining personal jurisdiction over the defendant." *In re Satyam Comput. Servs. Sec. Litig.*, 915 F.Supp.2d 450, 484 (S.D.N.Y. 2013) (quoting *Singer v. Bell*, 585 F.Supp. 300, 302 (S.D.N.Y. 1984) (quotation marks and citations omitted)). To prove personal jurisdiction under a theory of conspiracy, "a plaintiff must make a

*prima facie* showing of a conspiracy and allege specific facts warranting the inference that the defendants were members of the conspiracy." *Emerald Asset Advisors, LLC v. Schaffer*, 895 F.Supp.2d 418, 431 (E.D.N.Y. 2012) (quotation marks and citation omitted); *Sea Trade Mar. Corp. v. Coutsodontis*, No. 09-CV-488(BSJ), 2012 WL 3594288, at *7 (S.D.N.Y. Aug. 16, 2012).

 Making the *prima facie* case involves pleading four elements: "1. a corrupt agreement between two or more parties; 2. an overt act in furtherance of the agreement; 3. the parties['] intentional participation in the furtherance of the plan or purpose; and 4. the resulting damage or injury." *Emerald Asset Advisors*, 895 F.Supp.2d at 432.

The Court finds that the complaint alleges a *prima facie* showing of a conspiracy involving Viktor Khrapunov. For example, paragraph 43 of the Amended Crossclaims states that "Ablyazov remained in regular communication with his son-in-law, Ilyas Khrapunov, who assumed operational control of much of Ablyazov's money laundering operations and, in concert with Ablyazov and Viktor Khrapunov, has continued the Ablyazov–Khrapunov Group's combined efforts to hide their wealth." Dkt. No. 219 ¶ 43. The allegations of this paragraph are further supported by allegations made regarding the group's creation of accounts and sham entities owned or controlled by its members, and other steps its members took to conceal their alleged looting, and together are sufficient to state a *prima facie* case for a conspiracy. *See id.* ¶¶ 56–61 (describing their transfer of funds to entities in Switzerland), 66–76 (describing other shell entities and steps taken to avoid prosecution), & 77–97 (describing their attempts to hide the funds in the United States). These allegations are especially

sufficient given that, "great leeway should be allowed the pleader, since by nature of the conspiracy, the details may not be readily known at the time of the pleading." *Maersk, Inc. v. Neewra, Inc.*, 554 F.Supp.2d 424, 458 (S.D.N.Y. 2008) (internal citations omitted). Although subsequent discovery may refute these claims, the Kazakh Entities have met their limited burden at this stage with respect to this first hurdle.

■ But while the Court finds sufficient allegations that Viktor Khrapunov was a member of a conspiracy to launder money generally, and to launder money using entities in Switzerland, it is less clear that allegations are sufficient as to whether Viktor Khrapunov was a member of a conspiracy "to launder money into and through New York," as the Kazakh Entities claim. Dkt. No. 241 at 30. This speaks to the second legal barrier for those plaintiffs relying on a conspiracy theory of personal jurisdiction in New York. As to the specific membership of any particular defendant, the Court must consider whether "(1) the out-of-state coconspirator had an awareness of the effects of the activity in New York, (2) the New York coconspirators' activity was for the benefit of the out-of-state conspirators, and (3) that the coconspirators in New York acted at the behest of or on behalf of, or under the control of the out-of-state conspirators." *Emerald Asset Advisors*, 895 F.Supp.2d at 431 (internal quotation marks and citations omitted); *Maersk, Inc.*, 554 F.Supp.2d at 442–43.

■ The allegations presented to clear this jurisdictional bar are weak. The Kazakh Entities point to four places in the Amended Crossclaims that they argue allege Khrapunov's involvement in the conspiracy. Dkt. No. 241 at 31–32 (citing Dkt. No. 219 ¶¶ 43, 56–60, 72, & 77–97). Yet not a single paragraph expressly connects Viktor Khrapunov to the New York activities of the "Ablyazov–Khrapunov Group." They alternatively cite to allegations that speak to the "Group" as a whole and not to his individual involvement, Dkt. No. 219 ¶¶ 56–60, 77–97, or to allegations that relate to Viktor individually, but that in no way relate to the Group's New York activities. *Id.* ¶¶ 43, 72. Consequently, Crossclaim Plaintiffs simply do not sufficiently allege Viktor Khrapunov's "awareness of the effects of the activity in New York," nor that the coconspirators in New York "acted at the behest of or on behalf of, or under the control of" Viktor Khrapunov. *Emerald Asset Advisors*, 895 F.Supp.2d at 431. The mere fact that Ilyas is Viktor's son, and that Ilyas *is* alleged to have personally directed the New York activities, is insufficient to give rise to an inference that Viktor was involved in any New York activity, nor that Viktor directed, knew about, or had control over the activities in New York. *See First Capital Asset Mgmt., Inc. v. Brickellbush, Inc.*, 218 F.Supp.2d 369, 394–95, 399 (S.D.N.Y. 2002) (finding conclusory allegations of domination and control by out-of-state mother and uncle insufficient to confer personal jurisdiction on a conspiracy theory), *on reconsideration*, 219 F.Supp.2d 576, *aff'd sub nom. First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159 (2d Cir. 2004); *Ronar, Inc. v. Wallace*, 649 F.Supp. 310, 316 (S.D.N.Y. 1986) (finding conclusory allegations that an out-of-state father exercised control over his in-state son's actions insufficient for agency jurisdiction); *cf. Andre Emmerich Gallery, Inc. v. Segre*, No. 96-CV-889(CSH), 1997 WL 672009, at *5–6 (S.D.N.Y. Oct. 29, 1997) (citing letters and deposition testimony that lend credence to theory that out-of-state defendant controlled son's fraudulent acts in state and conferring personal jurisdiction).

As a result of these deficiencies, Crossclaim Plaintiffs fail to make a *prima facie*

case for personal jurisdiction over Viktor Khrapunov.

### b) Plaintiffs' Allegations Merit Jurisdictional Discovery

The Kazakh Entities suggest jurisdictional discovery as an alternative course of action "if there is any question over the extent of Viktor Khrapunov's involvement in the conspirators' New York investments," noting that the "parties have already begun merits discovery, so discovery of Viktor Khrapunov's role in the Triadou and Telford investment could proceed at the same time." Dkt. No. 241 at 32, n.8. Despite the deficiencies outlined above, the Court finds that jurisdictional discovery is merited.

█ Jurisdictional discovery is warranted where, even if plaintiff has "not made a *prima facie* showing, [they have] made a sufficient start toward establishing personal jurisdiction." *Stratagem Dev. Corp. v. Heron Int'l N.V.*, 153 F.R.D. 535, 547–48 (S.D.N.Y. 1994); *accord In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 207–08 (2d Cir. 2003) (per curiam). A court should "take care to 'give the plaintiff ample opportunity to secure and present evidence relevant to the existence of jurisdiction'. . . ." *APWU v. Potter*, 343 F.3d 619, 627 (2d Cir. 2003) (quoting *Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000)).

While the Court is certainly not obligated to allow jurisdictional discovery in this circumstance; *see Jazini v. Nissan Motor Co., Ltd.*, 148 F.3d 181, 185–86 (2d Cir. 1998), it is quite easy to see how jurisdictional discovery might enhance the Kazakh Entities' allegations as to Viktor Khrapunov's knowledge of and control of the conspiracy's activities in New York. For example, were the Kazakh Entities to uncover evidence of communications between Ilyas Khrapunov and his father Viktor about Ilyas's dealings with the Chetrit Group, it would then stand to reason that

Viktor was not only aware of the effects of the conspiracy's activities in New York, but also that the activities were partly conducted at his behest, given that it was the money Viktor allegedly embezzled from the City of Almaty that gave the conspiracy its purpose.

The allegations that the Kazakh Entities make as to the "Ablyazov–Khrapunov Group," while insufficient for a New York court's exercise of personal jurisdiction over Viktor Khrapunov at the present moment, are sufficient to warrant jurisdictional discovery. *See* Dkt. No. 219 ¶¶ 77–97.

### c) If Allegations or Evidence Emerges Sufficient for Jurisdiction under New York's Long–Arm Statute, Federal Due Process Concerns Will Also Be Satisfied

█ Finally, the exercise of personal jurisdiction by the Court must also comport with federal due process requirements. *See In re Aluminum Warehousing Antitrust Litig.*, 90 F.Supp.3d 219, 231–32 (S.D.N.Y. 2015) (finding the requirement of a due process inquiry even in cases of conspiracy jurisdiction). This means finding first, that the defendant purposefully established "minimum contacts" in the forum State, and second, that the exercise of such jurisdiction would not offend "fair play and substantial justice." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472–77, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985); *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 316, 320, 66 S.Ct. 154, 90 L.Ed. 95 (1945).

In this case, if the Kazakh Entities are successful at making a *prima facie* showing of personal jurisdiction over the out-of-state Viktor Khrapunov by way of New York's "conspiracy theory" of jurisdiction, there would certainly exist sufficient minimum contacts. This is because implicit in the showing that "the coconspirators in New York acted at the behest of or on

behalf of, or under the control of" Viktor Khrapunov, is Viktor's "purposeful availment" of the forum of New York to allegedly launder the stolen assets.

In this scenario, the exercise of jurisdiction would also comport with principles of "fair play and substantial justice." The Court's inquiry involves balancing the following five factors: (1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiffs interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies. *Asahi Metal Indus. Co. v. Superior Court of Cal.*, 480 U.S. 102, 113–114, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987). For many of the same reasons the Court finds the Individual Defendants' arguments in favor of *forum non conveniens* unpersuasive, *see supra* at Part II.C.1.b, so too must the Court conclude that exercising jurisdiction over Viktor Khrapunov here comports with federal due process requirements. Additionally, New York has a strong interest in ensuring that its real estate market is not utilized for the purpose of laundering money or as a safe harbor for stolen funds from foreign authorities. *See* Dkt. No. 219 ¶ 77; Louise Story & Stephanie Saul, *Hidden Wealth Flows to Elite New York Condos*, N.Y. Times, Feb. 8, 2015, at A1 (describing the flow of the proceeds of corruption into New York real estate).

Thus, if jurisdictional discovery yields information sufficient to grant this Court personal jurisdiction pursuant to New York's long arm statute over Viktor Khrapunov, due process requirements will not be a barrier to its exercise.

### III. Conclusion

For the foregoing reasons, Triadou's motion to dismiss for lack of subject matter jurisdiction is DENIED, the Kazakh Entities' motion for joinder of FBME is DENIED, the Individual Defendants' motions to dismiss Counts 6, 7, and 12 are DENIED, and the Individual Defendants' motion to dismiss Count 11 is GRANTED.

While denying at this juncture the Individual Defendants' motions to dismiss Counts 8, 9, and 10 as to the sufficiency of the pleadings, the Court will consider supplemental briefing on the applicable statutes of limitation. If the statutes of limitation are not longer than three years, these claims will also be dismissed. The Kazakh Entities' supplemental brief is due within ten days of the issuance of this Memorandum and Order, and shall be no longer than five pages. The Individual Defendants may reply within five days in a brief of no longer than three pages.

Viktor Khrapunov's motion to dismiss the claims against him for lack of personal jurisdiction is DENIED without prejudice to renew his claims following jurisdictional discovery, which is referred to Magistrate Judge Parker.

Triadou's application to strike paragraph 199 of the Amended Crossclaims is GRANTED, and the Kazakh Entities are directed to file revised amended crossclaims consistent with this Memorandum and Order within seven business days of its issuance.

This resolves Dkt. Nos. 216, 227, 231, and 268.

SO ORDERED.